IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: 2:22-CR-20134-MSN |
| COURTNEY WESTMORELAND, | * | |
| Defendant. | * | |

**DEFENDANT'S POSITION REGARDING THE
PRESENTENCE INVESTIGATION REPORT**

Courtney Westmoreland, through counsel of record, Angela D. Smith, hereby submits her position paper regarding the Presentence Investigation Report. In support, Ms. Westmoreland would submit the following:

### Position with Respect to the Presentence Investigation Report

On January 11, 2023, Probation prepared its draft Presentence Investigation Report ("PSR"). Defense counsel and Ms. Westmoreland have reviewed the PSR together. Ms. Westmoreland has the following objections to the PSR.

**I.    Ms. Westmoreland Objects to the Six-Level Enhancement for the intended loss amount.**

The PSR attributes a six-level enhancement to Ms. Westmoreland's guideline calculations based on an intended loss amount of $48,550. (*See* PSR ¶ 41). U.S.S.G. § 2B1.1 speaks only of "loss." The plain meaning of this word does not include intended loss. It is only in the Guidelines' commentary that intended loss is addressed. The Sentencing Commission is not permitted to add to a guideline through the commentary. Ms. Westmoreland therefore objects to the six-level

enhancement applied in this case, and submits that a four-level enhancement is more appropriate consistent with the actual loss amount of $27,550.

On June 30, 2020, Ms. Westmoreland received $11,500 from the Small Business Administration from a loan submitted to the Economic Injury Disaster Loan Program ("EIDL"). (*See* PSR ¶ 23). On February 28, 2021, Ms. Westmoreland submitted a second application to the Small Business Administration which was denied. (*See id.* ¶¶ 25 & 26). Additionally, Ms. Westmoreland received approximately $16,050 through the Unemployment Benefit Insurance Program. (*See id.* ¶ 34). The PSR states that "the total loss amount in this case is $48,550 which includes $27,550 in actual loss and $21,000 in intended loss. (*See* PSR ¶ 35). Ms. Westmoreland submits that her total loss amount, pursuant to U.S.S.G. § 2B1.1(b)(1)(C), is $27,550.

The word "loss," is not defined within the Guideline itself, but it is defined in the commentary. It is the commentary that defines loss as "the greater of the actual loss or intended loss." USSG §2B1.1, cmt. n. 3(A). Thus, the commentary differs from the Guideline. *United States v. Havis*, 927 F.3d 382, 385-386 (6th Cir. 2019).

The commentary is like an agency's interpretation of its regulations. *Stinson v. United States*, 508 U.S. 36, 40–41 (1993). Courts should not, however, "reflexively defer to an agency's interpretation. Before doing so, a court must find that the regulation is 'genuinely ambiguous, even after [the] court has resorted to all the standard tools of interpretation to eliminate that ambiguity." *United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)). And the Sixth Circuit has held that *Kisor*'s guidance about when to defer to agency interpretations applies to the commentary. *Id*. *Kisor* and *Riccardi* compel the conclusion that the loss amount here is $27,550 (actual loss), not $48,500 (intended loss).

Indeed, like the Sixth Circuit, the Third Circuit has noted the discrepancy between the

Guideline and the commentary, stating, "Only th[e] comment[ary], not the Guidelines' text, says that defendants can be sentenced based on the losses they intended." *United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021). The commentary is only relevant if the text of the guideline is ambiguous. *Riccardi*, 989 F.3d at 485. But the term "loss" is not ambiguous.

Another district court in the Sixth Circuit recently observed that "[b]ecause "loss" in § 2B1.1 is not genuinely ambiguous, deference to the commentary is not appropriate." *United States v. McKinney*, No. 22-cr-20249, 2022 WL 17547467, at * 8 (E.D. Mich. Dec. 9, 2022). In reaching its decision the court found no Sixth Circuit case had addressed whether "loss" defined under §2B1.1 is ambiguous; however, the court did rely on cases originating in the Eleventh and Third Circuits.

For instance, in *United States v. Alford*, No. 3:21-cr052/MCR, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022), the court held that "loss" is not genuinely ambiguous. *See id.* at *3. *Alford* considered the definitions of "loss" referenced in *Riccardi* as well as those that appear in "contemporary dictionaries," and it concluded that "loss" is unambiguous in the sense that there "is at least one element shared by *all* of the 'ordinary, contemporary, common meaning[s]' for the word 'loss' in *all* of its various contexts—concrete materialization of harm. *Id*. There is no reasonable construction of the 'plain and ordinary meaning' of loss that includes harm that did not actually materialize." *Id.* (alteration in original) (internal citation omitted). The court further found that "'[l]oss' cannot mean harm that never materialized" and that "the *only* ambiguity is that created by the Sentencing Commission itself by inserting 'intended loss' into the definition of 'loss.'" *Id.* at *3 & n.6. The court forcefully observed that it "'ha[d] no business deferring to any other reading' of the term, no matter how much the Government insists that doing so 'would make

3

more sense.'" *Id.* at *3 (quoting *Kisor*, 139 S. Ct. at 2415). The court thus declined to give *Auer*[1] deference to the commentary "defining 'loss' to include 'intended loss. Hence, as found in *Mckinney,* "deference to the commentary's definition of "loss" as including "intended loss" is not appropriate." *McKinney*, 2022 WL 17547467, at *9. Indeed, the *McKinney* court went on to rule that [i]nserting the word "intended" before the word "loss" changes the meaning of "loss" in a way that departs from its plain meaning. Because "intended" does not appear before "loss" in the guideline, the court chose to adhere to the plain meaning of the word "loss," which it found involved only materialized harm. *McKinney*, 2022 WL 17547467, at *8.

In *United States v. Banks*, 55 F.4th 246, 253 (3d Cir. 2022), the Third Circuit found that "the term 'loss' is unambiguous in the context of § 2B1.1." The court's analysis began with "the plain text of § 2B1.1." 55 F.4th at 256. The court noted that "[t]he Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary. That absence alone indicates that the Guideline does not include intended loss." *Id.* at 257. Moreover, the court observed that "dictionary definitions of 'loss,'" and as also noted *Riccardi*, "confirm[s]" that "[t]he ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss.'" *Id.* at 257-59 & n.54. The court found that "[n]one of these definitions suggest an ordinary understanding that 'loss' means 'intended loss.'" *Id.* at 258. It concluded that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered." *Id.* The court therefore "accord[ed] the commentary no weight." *Id.*

Based on this reasoning, Ms. Westmoreland submits that the actual loss in this case was $27,550, the materialized harm in this offense. Ms. Westmoreland avers that the Guidelines'

---

[1] *Auer v. Robbins*, 519 U.S. 452 (1997) (holding that a court should defer to an agency's interpretation of its own ambiguous regulation, so long as that interpretation is reasonable, even if the court believes another reasonable reading of the regulation is the better reading).

calculations and resulting advisory Guidelines range would be follows if calculated properly under U.S.S.G. § 2B1.1:

| Base Offense Level: | 7 |
|---|---|
| Specific Offense Characteristic pursuant to USSG §2B1.1(b)(1)(C): | +4 |
| Specific Offense Characteristic pursuant to USSG §2B1.1(b)(12): | +2 |
| Acceptance of Responsibility Credit: | -2 |
| Total Offense Level: | 11 |
| Criminal History Category: | I |
| Starting guidelines range: | 8-14months |

A. **18 U.S.C. § 3553(a) Factors.**

(1) **Nature and Circumstances of Offense and the History and Characteristics of the Defendant.**

(a) **Nature and Circumstances of the Offense.**

Ms. Westmoreland has accepted responsibility for her actions, has entered a plea of guilty in this matter, and she is now deemed a convicted felon. Ms. Westmoreland understands that it is her own actions that put her in jeopardy. She also fully understands that the funds she received were meant to help those persons who were severely impacted by the COVID-19 pandemic. She knows that receiving these funds was illegal and the funds could have been provided to someone

in need. To that end, Ms. Westmoreland has started making payments toward repaying the loan in this matter.[2]

### (b) History and Characteristics of Ms. Westmoreland

Courtney Westmoreland was born on June 20, 1984 in Memphis, Tennessee to Sheila Mallard and Michael Westmoreland (deceased). Ms. Westmoreland lived with her mom in the East Memphis area as a child. Her father was not involved in her upbringing, but she was able to meet her father before he passed away. Ms. Westmoreland is the oldest child of the family. She had an older brother named Cortez Mallard, but he was murdered in 2012.[3]

Ms. Westmoreland has three children. She has two adult daughters and one teenage son. Ms. Westmoreland had her first child at age 15. Ms. Westmoreland had her second child in 2002 at age 18. Despite the fact Ms. Westmoreland was a young, single mom, she remained in high school and graduated from Wooddale High School in 2003.

After graduating high school, Ms. Westmoreland began working to provide for her children. She eventually went on to attend the University of Phoenix for four years and pursued a degree in Criminal Justice.[4] Unfortunately, Ms. Westmoreland did not finish her degree. Ms. Westmoreland says that she stopped attending the University of Phoenix so she could get a second job to provide for her children. However, she continues to advocate for her children to pursue their education, and she supports all her children financially. Both of her daughters are currently enrolled in college, and her son is a sophomore in high school.

Ms. Westmoreland has a substantial work history. In fact, Ms. Westmoreland has maintained steady employment since age 16. She currently has two jobs. She works as a cashier

---

[2] Exhibit #1, U.S. Small Business Administration Payment Activity.
[3] Exhibit #2, Affidavit of Complaint.
[4] Exhibit #3, University of Phoenix Transcript.

6

at Kroger from 7:00 a.m. to 1:30 p.m. Monday through Friday, and she also works at Olympus Surgical Technologies from 3:00 p.m. to 11:30 p.m. Monday through Friday.

Attached is a letter from Ms. Westmoreland's employer at Kroger.[5] Ms. Kendra Harris, former store leader at Kroger, wrote "[s]ince working with Courtney, she has always been a team player and very helpful to all customers that she encounters daily." Ms. Harris went on further to say that, "[h]er (Ms. Westmoreland) work ethic speaks volumes to the contributions she provides to the company."

        **(i)     Mental Health/Emotional Health/Substance Abuse:**

Ms. Westmoreland has never received any sort of mental health treatment or counseling. (*See* PSR¶ 72). In fact, there is no indication that it is necessary. Ms. Westmoreland denied the use of any controlled substances. *Id.* at ¶ 73. Furthermore, Ms. Westmoreland has no prior arrests or convictions for any drug related offenses.

    **(c)     Other pertinent 18 U.S.C. §3553(a) factors.**

        **(i)     reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

Ms. Westmoreland submits that she understands the seriousness of the offense, and she does respect the law. She has expressed great remorse over her actions and understands the consequences of them, explaining that because of her actions, she has become a "convicted felon and lost so many rights." (*See* PSR ¶ 38). She realizes what she has lost by making the decision to apply for those loans fraudulently. The requested sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

---

[5] Exhibit #4, Letter from Ms. Kendra Harris.

7

      **(ii)    afford adequate deterrence to criminal conduct**

Ms. Westmoreland submits that the requested sentence will show other similarly situated offenders that receiving fraudulent government funds can have a detrimental impact on one's life for a small monetary gain.

      **(iii)    protect the public from further crimes of Ms. Westmoreland**

Ms. Westmoreland's arrest history does not include any prior felony convictions or any convictions for firearm offenses or drug offenses. Ms. Westmoreland's criminal history only includes offenses for driving while license suspended. Ms. Westmoreland currently has a valid driver's license, and she has not been charged or convicted of a driving offense or any offense since November 2014.

It appears that this offense was the result of a temporary and aberrant lack of judgement. Ms. Westmoreland is currently employed at two different places of employment, and she is a full-time mom and a stable member of her community. Additionally, since being on release for this offense, Ms. Westmoreland has not had any violations of her pretrial release. It is unlikely that she will commit any new offense, and there is no present danger to the public.

      **(iv)    provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Ms. Westmoreland graduated from Wooddale High School in May 2003, and she attended some college. (*See* PSR ¶¶ 74 & 75). Additionally, Ms. Westmoreland has a significant work history. The BOP will most likely be unable to afford her any further educational or vocational training.

      **(v)    The Need to Avoid Unwarranted Disparities**

Five current or former IRS employees were charged in this district with crimes relating to the Paycheck Protection Program (PPP) and EIDL Program, both federal stimulus programs authorized as part of the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Two of those defendants have already been sentenced to noncustodial sentences.

In *United States v. Tina Humes*, Case No. 22-20175-SHL, Ms. Humes was employed as a Lead Management and Program Assistant in the Human Capital Office with the Internal Revenue Service. Ms. Humes fraudulently obtained $123,612 in COVID-19 relief funds. On October 28, 2022, Ms. Humes was sentenced to time served followed by a three-year period of supervised release with the added condition that the first six months were to be served on home detention.

In *United States v. Roderick White*, Case No. 22-20198-SHL, Mr. White was also an employee with the Internal Revenue Service as Contact Representative in the Wage and Investment Service Centers Department. Mr. White fraudulently obtained $66,666. On December 12, 2022, Mr. White was sentenced to time served followed by a two-year period of supervised release with the added condition that the first six months were to be served on home detention.

Ms. Westmoreland obtained $27,050 in pandemic funds, thousands of dollars less than those who have already been sentenced in this district. A sentence to time served followed by a two-year term of supervised release would avoid unnecessary sentencing disparities.

## **CONCLUSION**

Defense counsel will address the individual 18 U.S.C. §3553(a) factors at sentencing. Ms. Westmoreland asks the Court to sentence her to time served followed by a two-year term of supervised release. Defense counsel anticipates the sentencing hearing will take no longer than one hour. The defense anticipates that at least one individual will speak on Ms. Westmoreland's behalf.

Respectfully Submitted,

DORIS RANDLE-HOLT
FEDERAL DEFENDER

/s/ Angela D. Smith
Assistant Federal Defender
200 Jefferson Ave., Suite 200
Memphis, TN 38103
(901) 544-3895

## **CERTIFICATE OF SERVICE**

I, Angela D. Smith, certify that a true copy of the foregoing was forwarded via the Court's electronic filing system to Carroll Andre, Assistant United States Attorney, Clifford Davis and Odell Horton Federal Office Building, Suite 800, 167 North Main Street, Memphis, Tennessee, 38103.

This, the 10th day of March 2023.

/s/ Angela D. Smith
Assistant Federal Defender

# EXHIBIT #1

# Payment Activity on
# 03/01/2023
## for Courtney Westmoreland

## Account

**SBA Loan Number**



**Loan Type**
Disaster COVID-19 Economic Injury

**Loan Status**
Disbursed Current

## Payment Schedule

**Payment Schedule**
One Time

**Payment Frequency**
One Time

**Number of Installments**
1

**First Payment Date**
03/01/2023

## Payment Details

**Payment Method**
Debit Card

**Confirmation ID**

**Status**
Processed

**Amount**
$111 00

**Card Number**
**** **** **** 

**Expiration Date**

# EXHIBIT #2

# AFFIDAVIT OF COMPLAINT

**STATE OF TENNESSEE**
**SHELBY COUNTY**

Personally appeared before me Sgt. Eric P. Freeman and made oath that on or about the 21st day of July 2012, in said County, and within the jurisdiction of the Criminal Court of Shelby County, Tennessee, one Kierrra D. Brooks, ■, Female, whose last known address is ███████████████████, did unlawfully commit the offense of **First Degree Murder 39-13-202 in the Perpetration of Attempted Especially Aggravated Robbery 39-13-403** and the essential facts constituting said offense and the source of the affiant's information are as follows:

On July 21, 2012, MPD Uniform Patrol responded to a shooting call at 2541 Corporate which is the location of the Homestead Suites Hotel. Upon arrival, Officers found the victim, Cortez Mallard deceased in the hotel lobby with numerous gunshot wounds. The Medical Examiners Office ruled the death a homicide due to the gunshot wounds. The investigation revealed that Kierra Brooks called the victim, Cortez Mallard and had him meet her at the Homestead Hotel. Kierra Brooks also had a codefendant waiting at the hotel to rob the victim. When Kierra Brooks met with the victim, the codefendant ran up and shot and killed the victim in an attempt to rob him. A witness identified Kierra Brooks from a six person photographic lineup as the person he saw at the scene when Cortez Mallard was shot and killed. This offense occurred in Memphis Shelby County Tennessee.

_____
Affiant   201 Poplar

Sworn to and subscribed before me this 30 day of July, 2012.

_____
Judicial Commissioner, General Sessions Criminal Court

**STATE OF TENNESSEE**             **WARRANT**
**SHELBY COUNTY**

TO ANY LAWFUL OFFICER OF THE STATE:

Information on oath having been made that the offense of **First Degree Murder 39-13-202 in the perpetration of Especially Aggravated Robbery 39-13-403** has been committed, and accusing **Kierra D. Brooks** thereof. YOU ARE HEREBY COMMANDED IN THE NAME OF THE STATE TO ARREST said defendant and bring her before me or any Judge of the General Sessions Criminal Court of Shelby County.
This 30 day of July, 2012.
Bond is set at $ BT(✓)

_____
Judicial Commissioner, General Sessions Criminal Court

# EXHIBIT #3



Print Date: 09/05/2022

**Unofficial Transcript**
Not For Official Use

| *Record of:* |
|---|
| Courtney Q Westmoreland |
| *Student Number:* |
| 9022644971 / \*\*\*-\*\*-\*\*\*\* |
| *Birthdate:* |
| |
| *Enrollment Status:* |
| Withdrawn |
| *Enrollment Status Effective Date:* |
| 04/29/2015 |

| BSCJA/M Program GPA : 2.04 |
|---|
| AACJ Program GPA : 2.02 |

## UNIVERSITY OF PHOENIX

| Mo/Year | Course ID | Course Title | Grade | Credits Attempted | Credits Earned | Quality Points | Rep |
|---|---|---|---|---|---|---|---|
| 04/2010 | GEN/195 | FOUNDATIONS OF UNIVERSITY STUDIES | B+ | 3.00 | 3.00 | 9.99 | |
| 05/2010 | FP/120 | ESSENTIALS OF PERSONAL FINANCE | C+ | 3.00 | 3.00 | 6.99 | |
| 06/2010 | SCI/163 | Elements of Health and Wellness | C- | 3.00 | 3.00 | 5.01 | |
| 08/2010 | COM/170 | ELEMENTS OF UNIVERSITY COMPOSITION AND COMMUNICATION I | A- | 3.00 | 3.00 | 11.01 | |
| 09/2010 | HUM/186 | Media Influences on American Culture | B- | 3.00 | 3.00 | 8.01 | |
| 10/2010 | COM/172 | ELEMENTS OF UNIVERSITY COMPOSITION AND COMMUNICATION II | W | 0.00 | 0.00 | 0.00 | |
| 11/2010 | PSY/211 | ESSENTIALS OF PSYCHOLOGY | D | 3.00 | 3.00 | 3.00 | |
| 01/2011 | COM/172 | ELEMENTS OF UNIVERSITY COMPOSITION AND COMMUNICATION II | C- | 3.00 | 3.00 | 5.01 | |
| 02/2011 | HUM/114 | CRITICAL THINKING AND CREATIVE PROBLEM SOLVING | C- | 3.00 | 3.00 | 5.01 | |
| 04/2011 | SOC/100 | Introduction to Sociology | B | 3.00 | 3.00 | 9.00 | |
| 05/2011 | REL/133 | World Religious Traditions I | C+ | 3.00 | 3.00 | 6.99 | |
| 06/2011 | CJA/214 | Introduction to Police Theory and Practices | D | 3.00 | 3.00 | 3.00 | |
| 08/2011 | SCI/220 | Human Nutrition | W | 0.00 | 0.00 | 0.00 | |
| 09/2011 | SCI/256 | People, Science and the Environment | D+ | 3.00 | 3.00 | 3.99 | |
| 10/2011 | MTH/208 | COLLEGE MATHEMATICS I | W | 0.00 | 0.00 | 0.00 | |
| 01/2012 | SOC/315 | Cultural Diversity | C- | 3.00 | 3.00 | 5.01 | |
| 02/2012 | PSY/320 | Human Motivation | D | 3.00 | 3.00 | 3.00 | |
| 03/2012 | SOC/110 | Teamwork, Collaboration, and Conflict Resolution | C- | 3.00 | 3.00 | 5.01 | |
| 05/2012 | CJA/204 | Introduction to Criminal Justice | C+ | 3.00 | 3.00 | 6.99 | |
| 06/2012 | COMM/470 | COMMUNICATING IN THE VIRTUAL WORKPLACE | B | 3.00 | 3.00 | 9.00 | |
| 07/2012 | CJA/224 | Introduction to Criminal Court Systems | W | 0.00 | 0.00 | 0.00 | |



Print Date: 09/05/2022

# Unofficial Transcript
## Not For Official Use

| Mo/Year | Course ID | Course Title | Grade | Credits Attempted | Credits Earned | Quality Points | Rep |
|---|---|---|---|---|---|---|---|
| 08/2012 | CJA/224 | Introduction to Criminal Court Systems | W | 0.00 | 0.00 | 0.00 | |
| 09/2012 | COM/350 | Organizational Communication | D- | 3.00 | 3.00 | 2.01 | |
| 10/2012 | CJA/224 | Introduction to Criminal Court Systems | B | 3.00 | 3.00 | 9.00 | |
| 11/2012 | CJA/234 | Introduction to Corrections | C | 3.00 | 3.00 | 6.00 | |
| 01/2013 | CJA/304 | Interpersonal Communications | D+ | 3.00 | 3.00 | 3.99 | |
| 02/2013 | CJA/314 | Criminology | W | 0.00 | 0.00 | 0.00 | |
| 03/2013 | CJA/324 | Ethics in Criminal Justice | B- | 3.00 | 3.00 | 8.01 | |
| 04/2013 | CJA/334 | RESEARCH METHODS IN CRIMINAL JUSTICE | B | 3.00 | 3.00 | 9.00 | |
| 06/2013 | HUM/150 | Introduction to Film Studies | F | 3.00 | 0.00 | 0.00 | R |
| 07/2013 | MTH/208 | COLLEGE MATHEMATICS I | C- | 3.00 | 3.00 | 5.01 | |
| 08/2013 | CJA/314 | Criminology | B- | 3.00 | 3.00 | 8.01 | |
| 09/2013 | HPE/170 | HEALTH AND PHYSICAL EDUCATION | C- | 3.00 | 3.00 | 5.01 | |
| 11/2013 | SOC/105 | INTRODUCTION TO POPULAR AMERICAN CULTURE | B+ | 3.00 | 3.00 | 9.99 | |
| 12/2013 | HUM/150 | Introduction to Film Studies | C- | 3.00 | 3.00 | 5.01 | |
| 02/2014 | MTH/219 | Introduction to College Algebra | F | 3.00 | 0.00 | 0.00 | |
| 07/2014 | CJA/354 | Criminal Law | W | 0.00 | 0.00 | 0.00 | |
| 10/2014 | MTH/209 | COLLEGE MATHEMATICS II | W | 0.00 | 0.00 | 0.00 | |
| 11/2014 | CJA/344 | Cultural Diversity Issues in Criminal Justice | W | 0.00 | 0.00 | 0.00 | |
| 04/2015 | CJA/354 | Criminal Law | W | 0.00 | 0.00 | 0.00 | |

## GPA

| | GPA | Credits Attempted | Credits Earned | Quality Points |
|---|---|---|---|---|
| Total Cumulative Credits: | | | 84.00 | |
| UOPX Cumulative: | 2.04 | 90.00 | 84.00 | 177.06 |

End of Unofficial Transcript

Page 2 of 2

# EXHIBIT #4

To Whom it May Concern,

I am writing this letter on behalf of Courtney Westmoreland to attest to her character and ethic.

Courtney began working at Kroger Sept 01, 2021, and I arrived at the store at the end of Oct as the store leader. Since working with Courtney, she has always been a team player and very helpful to all customers that she encounters daily. On numerous occasions, she has received customer compliments for her efforts to ensure all customers are highly satisfied, which is one of our top priorities here at Kroger. She is always on time and completes whatever tasks are before her. Her work ethic speaks volumes to the contributions she provides to the company.

Since working with Courtney, she has always spoken very highly of her children and granddaughter and the lengths that she goes through to ensure they are cared and provided for. She has worked hard in this time to make sure that her family receives a proper and solid education to pave the way for a future that they are proud of.

In closing, I can attest that Courtney has been as asset to the team and has not presented in any way that she bears no malice towards anyone.

Kind Regards,

Kendra Harris- Kroger Store Leader